UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| CODY WITT,<br><br>     Plaintiff,<br><br>v.<br><br>CITY OF POCATELLO, POCATELLO POLICE DEPARTMENT, MATTHEW SHUTES, RICHARD SAMPSON, and J.R. MILLER,<br><br>     Defendants. | Case No. 4:11-cv-00484-CWD<br><br>**MEMORANDUM DECISION AND ORDER** |

   This is a lawsuit filed under 42 U.S.C. Section 1983. Plaintiff Cody Witt claims that Defendants, the City of Pocatello, the Pocatello Police Department, Officer Matthew Shutes, Officer Richard Sampson, and former Chief of Police J.R. Miller, violated Idaho law and his Fourth Amendment right to be free from unlawful seizure during his arrest on February 20, 2011.

   Witt claims Officers Sampson and Shutes used excessive force to effectuate the arrest by, among other conduct, using tasers on him after Witt surrendered. With respect to the City of Pocatello, the Pocatello Police Department, and former Chief Miller (the Municipal Defendants), Witt claims they should be held liable for condoning the Officers' unconstitutional conduct, failing to properly train the Officers on the lawful use of tasers, and otherwise maintaining policies that led to the violation of Witt's

constitutional rights. Defendants deny Witt's allegations and move for summary judgment on all of his claims. In addition, Defendants object to portions of Witt's statement of disputed facts.

The Court heard arguments on Defendants' motion for summary judgment and motion to strike on March 11, 2014. After considering the parties' briefing, counsels' arguments, and the record submitted on the motion, and for reasons more fully discussed below, the Court will grant in part and deny in part the motion for summary judgment.

## FACTS

The following facts are undisputed or, when disputed, taken in the light most favorable to Witt, the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 474 U.S. 574, 587 (1986) (recognizing the district court's obligation to construe the record in the light most favorable to the non-moving party on motion for summary judgment).

On the night of February 20, 2011, Officers Sampson and Shutes were separately patrolling the streets of Pocatello. At approximately 10:15 p.m. Shutes observed a parked green Cadillac, which Pocatello Police narcotics investigators previously had identified as possibly being involved in marijuana distribution. (Dkt. 51-4, Shutes Aff. ¶ 5.) Shutes continued on his patrol and later noticed the same Cadillac driving down a street. (*Id.*) Shutes radioed Sampson and advised him of the Cadillac's location and direction of travel. (*Id.*)

Sampson knew that the Cadillac's registered owner, Witt, was under investigation by the Pocatello Police Department Narcotics Division for possession and delivery of

marijuana. (Dkt. 54-7, Sampson Aff. ¶ 5.) Based on Shutes's directions, Sampson

observed the Cadillac driving on Alameda Road and began following it. (*Id.* ¶¶ 5-6.)

Sampson observed the Cadillac fail to maintain its lane on two occasions, at which point

he activated his overhead lights and conducted a traffic stop.[1] (*Id.* ¶ 6.) The vehicle turned

onto a residential street. As the Cadillac came to a stop, it drove up on the curb before

pulling off the curb and stopping on the street. (*Id.*) These observations led Sampson to

suspect the driver possibly was intoxicated.[2] (*Id.*)

    Sampson exited his patrol car and approached the Cadillac, where Witt sat in the

driver's seat. (*Id.* at 58:20-23.) While approaching the driver's side window, Sampson

detected the odor of marijuana and observed Witt in the driver's seat with a green leafy

substance loose on his lap. (Dkt. 51-7, Sampson Aff. ¶ 7.) Based on his training,

Sampson recognized the substance as marijuana.[3] (*Id.*) Sampson ordered Witt to exit the

vehicle, and Witt complied. (*Id.* at 61:14-18.) Meanwhile, Officer Shutes arrived on the

scene and witnessed the unfolding scuffle between Sampson and Witt. (Dkt. 51-4, Shutes

Aff. ¶ 7.)

---

[1]    Dashboard camera video from Sampson's patrol car confirms that the Cadillac failed to maintain its lane twice before Sampson activated his overhead lights. (Dkt. 51-7, Sampson Aff. Ex. D.) Witt contends that he maintained his lane, (Dkt. 58-3, Witt. Depo. 68:20-21.) but, given the video, there is no genuine dispute as to this fact.

[2]    Witt later confirmed that he had smoked one half gram of marijuana at some point between 5:00 p.m. and 10:22 p.m., when he was pulled over by Sampson while driving the Cadillac. (Dkt. 58-3, Witt. Depo. 57:18-21.)

[3]    Witt later acknowledged that he was attempting to hide the marijuana as Sampson approached. (Dkt. 58-3, Witt. Depo. 61:2-11.)

The Cadillac began to roll forward as Witt exited the vehicle, at which point Sampson ordered Witt to put the vehicle in park and exit. (Dkt. 51-7, Sampson Aff. ¶ 8.) Dashboard camera video of the arrest confirms that the Cadillac moved forward slightly when Witt began to step out. (*Id.* at Ex. D.) Officer Shutes also observed the Cadillac roll forward, then exited his patrol car, and began to walk around Officer Sampson's patrol car toward the other two men.

According to Witt, Sampson said nothing and immediately grabbed Witt's right arm as Witt exited the vehicle.[4] (Dkt. 58-3, Witt. Depo. 61:19-24.) Feeling threatened, Witt attempted to break free from Sampson's grasp. (*Id.*) Shutes watched as Witt and Sampson momentarily grappled in the street. (Dkt. 51-4, Shutes Aff. ¶ 7.) Shutes began to run toward the altercation just as Witt slipped out of his shirt, his jacket, and Sampson's grasp. (*Id.*) Shirtless, Witt ran away from the parked vehicles for approximately 20 yards.[5] (Dkt. 58-3, Witt. Depo. 58:20-59:5.) Both Sampson and Shutes pursued on foot, commanding Witt to stop or be tased. (*Id.*) During the pursuit, the officers observed Witt throw something into a yard. (Dkt. 51-7, Sampson Aff. ¶ 10.) Witt

---

[4]    Sampson states he advised Witt that Witt was under arrest for possession of marijuana as Witt exited the vehicle. (Dkt. 51-7, Sampson Aff. ¶ 9.) Witt reports that Sampson said nothing before he grabbed Witt's right arm. (Dkt. 58-3, Witt Depo. 61:21-22.) The video from Sampson's patrol car has no audio. Thus, the Court must adopt Witt's version of whether Sampson told Witt he was under arrest for the purposes of summary judgment.

[5]    At this point the dashboard camera video from Sampson's patrol car shows Witt and the officers run into the distance. The scene is dark, and it is not at all clear what happened next. (Dkt. 51-7, Sampson Aff. Ex. D.)

then stopped in a driveway, raised his hands in surrender, and turned around to face the pursuing officers.[6] (*Id.*)

Standing on the driveway approximately 10 feet from Witt, Shutes activated his taser in dart mode, but it was ineffective. (Dkt. 51-4, Shutes Aff. ¶ 8.) Then, Sampson, also using dart mode, fired his taser at Witt from a distance of approximately 10 feet. (Dkt. 51-7, Sampson Aff. ¶¶ 10-11.) The taser darts struck Witt on the left forearm near the elbow and on the left thigh—a so-called "dual hemisphere hit." (*Id.* ¶ 11.) Sampson delivered a four-second taser cycle to Witt, causing complete neuromuscular incapacitation. (*Id.* ¶¶ 12-13.) Before either officer could reach him, Witt fell backward and struck his head on the concrete driveway. (*Id.* ¶ 12.)

According to Witt, one or both of the officers delivered several additional blows to Witt's head after he fell.[7] (Dkt. 58-3, Witt. Depo. 64:19-23.) Witt rolled onto his chest, covered his face from the blows, and lost consciousness shortly thereafter. (*Id.* 65:2-14.) Witt regained consciousness as he was being handcuffed. (*Id.* 65:15.) Sampson advised Witt that he was under arrest, called for an ambulance, inspected Witt, and observed blood flowing from an area near Witt's left ear. (Dkt. 51-7, Sampson Aff. ¶ 13.) Police

---

[6] Both officers state that Witt turned around with his fists raised "in an aggressive, fighting posture." (Dkt. 51-4, Shutes Aff. ¶ 9; Dkt. 51-7 Sampson Aff. ¶ 10.) But the Court, viewing the disputed facts in Witt's favor, will assume that Witt raised his hands as a gesture of surrender.

[7] Neither officer reported striking Witt after he fell. (Dkt. 51-4, Shutes Aff. ¶ 9; Dkt. 51-7 Sampson Aff. ¶ 13.) For the purposes of summary judgment, however, the Court accepts Witt's version of events. Witt's account is consistent with photos of the scene. (Dkt. 58-6 at 7-8.) But it is not clear from the record whether Witt rolled himself onto his chest after being tased or whether the officers rolled Witt onto his chest to handcuff him.

photos of the scene show Witt on his back with blood on the left side on his face and a pool of blood to the right of his head, suggesting that Witt was initially on his chest and later rolled onto his back. (Dkt. 58-6 at 7-8.) Officer Sampson's report also indicates that Witt was handcuffed while lying on his chest. (Dkt. 51-8 at 7-8.) The two officers and Witt were the only people to witness these events.

An ambulance arrived on the scene at 10:26 p.m., four minutes after Sampson pulled over Witt. (Dkt. 51-7, Sampson Aff. Ex. D.) Witt, lapsing in and out of consciousness, was placed on a stretcher and was taken by ambulance to the hospital. (Dkt. 58-3, Witt. Depo. 65:16-21.) According to Officer Sampson's report, emergency room staff determined Witt had internal bleeding between his skull and the membrane around his brain. (Dkt. 51-8 at 2.) Due to this condition Witt was transported from the Portneuf Medical Center emergency room in Pocatello to the Eastern Idaho Regional Medical Center in Idaho Falls. (*Id.*) Other than Sampson's report, the record contains no evidence of the nature of Witt's injuries or what medical treatment he received.

After Witt was transported to the hospital, the officers surveyed the scene. They recovered $330.00 in cash and a quantity of marijuana from the driver's side floor of Witt's car. (Dkt. 51-4, Shutes Aff. ¶ 10.) They also found 17 pills scattered between the traffic stop and the driveway, as well as a plastic bag containing white residue in the yard adjacent to the driveway. [8] (Dkt. 51-7, Sampson Aff. ¶ 16.) Sampson later determined the residue and pills were methadone. (Dkt. 51-8 at 9-10.) Following his arrest, Witt was

---

[8]      Witt later admitted to throwing away the pills and the baggie while he ran from the officers. (Dkt. 58-3, Witt. Depo. 63:6-21.)

charged with possession of marijuana, resisting or obstructing officers, possession of methadone, and destruction or concealment of evidence. (Dkt. 51-3.) He later pled guilty to possession of marijuana, and the remaining counts were dismissed by motion of the prosecutor. (*Id.*)

The Pocatello Police Department has policies and procedures for the use of force by its officers. The use of force policy is attached to the affidavits of Officers Shutes and Sampson. (Dkt. 51-6; 51-11.) In addition, the Pocatello Police Department has adopted policies and procedures governing the use of tasers. The taser policy is attached to the affidavit of Officer Sampson. (Dkt. 51-10.) In general, both policies require officers to use reasonable force based on their assessment of the totality of the circumstances.

The taser policy requires that officers be properly trained and authorized before carrying or using a taser. The taser policy also recommends a verbal warning before using the taser. Further, the policy cautions against using a taser on "[i]ndividuals whose position or activity may result in collateral injury (e.g. falls from height, operating vehicles)" unless the totality of the circumstances leads the officer to reasonably believe the risk of using the taser is outweighed by other factors. (*Id.* at § 309.4.3.)

On February 20, 2011, both Officers Sampson and Shutes were current on their training and certifications. (Dkt. 51-4, Shutes Aff. ¶ 2; Dkt. 51-7, Sampson Aff. ¶ 2.) At the time of the incident, Sampson had served on the Pocatello Police Department for 11 years and Shutes had served for 10 years. (*Id.*) Shutes was up to date on his taser training. (Dkt. 51-4, Shutes Aff. ¶ 3.) Sampson was also up to date on his taser training, and was certified to instruct others on taser use. (Dkt. 51-7, Sampson Aff. ¶ 3.) Both officers were

specifically trained on the Pocatello Police Department's policies and procedures for taser use and the appropriate use of force. (Dkt. 51-4, Shutes Aff. ¶ 4; Dkt. 51-7, Sampson Aff. ¶ 4.)

Based on these facts, Witt brings suit under 42 U.S.C. § 1983, claiming Defendants acted under color of law in violation of his Fourth Amendment right to be free from unlawful seizure. (Dkt. 1 ¶ 39.) In addition, Witt brings a variety of pendent state law claims sounding in tort: assault, battery, false arrest, excessive force, negligent and intentional infliction of emotional distress, conspiracy, negligence, and gross negligence. (*Id.* ¶¶ 41-43.) Defendants seek summary judgment on all of Witt's claims. In connection with the motion for summary judgment, the Court also received Witt's opposition to the motion for summary judgment (Dkt. 58), Defendants' motion to strike portions of Witt's statement of facts (Dkt. 59), and Defendants' reply in support of summary judgment (Dkt. 61). Witt has not responded to the motion to strike. Having heard oral argument on all pending motions on March 11, 2014, this matter is now ripe for the Court's review and decision.

## MOTION TO STRIKE

In a bare-bones filing, Defendants object to paragraphs 12 and 13 from Witt's Statement of Disputed Facts, (Dkt. 58-1), filed in opposition to Defendants motion for summary for summary judgment. (Dkt. 59.)The disputed paragraphs read as follows:

> 12. The police officers failed to follow the departmental policies found in its Policy Manual including but not limited to its guidelines on verbal and visual warnings, factors to determine reasonableness of force and application of the taser restricting the use of the taser on individuals including Witt. (Morrissey Dec., Exh, "6").

> 13. Pocatello Police Department failed to properly train its officers in established Ninth Circuit Case Law and taught its officers to ignore established law concerning "quantum of force" and avoiding all reference to such law and instead strictly adhering to the more flexible "objective reasonableness" standard preferred by law enforcement. (Morrissey Dec., Exh, "7").

(Dkt. 58-1 at 3.) Defendants argue—without citing any authority—that these paragraphs contain impermissible legal arguments and offer exhibits without proper foundation. To date, Witt has not responded to the motion to strike.

With only Defendants' vacuous showing, the Court is left to search out the legal basis for Defendants' requested relief. Rule 56(c)(2) permits evidentiary objections to materials cited to support or dispute a fact at issue in a motion for summary judgment.[9] Defendants' objections to the exhibits appear grounded on Rule 402 of the Federal Rules of Evidence, which states that "[i]rrelevant evidence is not admissible." Defendants' objections to the paragraphs themselves appear grounded on the rule that conclusory opinions are not admissible if they merely tell the trier of fact what result to reach. *See U.S. v. Crawford*, 239 F.3d 1086, 1090 (9th Cir. 2001); *see also* Fed. R. Ev. 704, 1972 Advisory Committee Notes (Rules 701, 702, and 403 "afford ample assurances against the admission of opinions which would merely tell the jury what result to reach.")

Paragraphs 12 and 13 both state conclusions rather than disputed facts. Paragraph 12 asserts "[t]he police officers failed to follow the departmental polices…." (Dkt. 58-1

---

[9]     Defendants style their evidentiary objection as a "motion to strike," which is the appropriate motion for contesting the content of *pleadings*. *See* Fed. R. Civ. P. 12(f). Counsel would do well to identify the rule authorizing their motion and clearly state the grounds for future filings.

at 3.) And Paragraph 13 claims the "Pocatello Police Department failed to properly train its officers in established Ninth Circuit case law…." (*Id.*) Both statements tell the reader what legal conclusion to reach based on Witt's version of the facts—the officers *failed* to follow polices and the department *failed* to properly train the officers. Furthermore, Witt does not provide adequate foundation to establish the relevance of the memorandum referenced as Exhibit 7 in Paragraph 13.[10] Accordingly, the Court will sustain in part Defendants' objections and will not consider Paragraph 12, Paragraph 13, or the exhibit referenced in Paragraph 13.

## MOTION FOR SUMMARY JUDGMENT

Defendants seek summary judgment on all of Witt's claims. Rule 56 directs the court to "grant summary judgment if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Critically, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). "A dispute about a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving

---

[10]     Curiously, Defendants object to the exhibit referenced Paragraph 12, (Dkt. 58-8), which is a copy of the Pocatello Police Department Taser Guidelines. This document is identical to the taser guidelines attached to Officer Sampson's Affidavit (Dkt. 51-10). In other words, Defendants object a document they previously and voluntarily introduced into the record. Accordingly, the Court will consider the Pocatello Police Department Taser Guidelines.

party.'" *FreecycleSunnyvale v. Freecycle Network*, 626 F.3d 509, 514 (9th Cir.2010) (quoting *Anderson*, 477 U.S. at 248).

"The moving party initially bears the burden of proving the absence of a genuine issue of material fact." *In re Oracle Corp. Secs. Litig.*, 627 F.3d 376, 387 (9th Cir.2010) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "Where the non-moving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case." *Id.* "Where the moving party meets that burden, the burden then shifts to the non-moving party to designate specific facts demonstrating the existence of genuine issues for trial." *Id.* "If a party... fails to properly address another party's assertion of fact as required by Rule 56(c), the court may... consider the fact undisputed for the purposes of the motion." Fed. R. Civ. P. 56(e)(2).

Factual disputes that would not affect the outcome of the suit are irrelevant to the resolution of a motion for summary judgment. *Anderson*, 477 U.S. at 248. As to the specific facts offered by the nonmoving party, the Court does not weigh conflicting evidence but draws all inferences in the light most favorable to the nonmoving party. *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). Likewise, direct testimony of the nonmoving party, however implausible, must be believed because the Court cannot resolve credibility questions at the summary judgment stage. *Leslie v. Groupo ICA*, 198 F.3d 1152, 1159 (9th Cir. 1999).

But, when confronted with a purely legal question, the Court does not defer to the nonmoving party.

### 1. Section 1983 Claim

Defendants' motion for summary judgment states three general grounds for dismissal of Witt's § 1983 unlawful seizure claim. First, Defendants' contend Witt's claims are barred by *Heck v. Humphrey*. 512 U.S. 477 (1994). Second, they argue Officers Sampson and Shutes are entitled to qualified immunity for their use of force against Witt. And third, Defendants' maintain that Witt states a noncognizable respondeat superior claim against the Municipal Defendants. The Court addresses each of these arguments below.

#### A.    *Witt's Conviction Does Not Bar His § 1983 Claim*

As a preliminary matter, Defendants claim that Witt's § 1983 claims are wholly barred under the United States Supreme Court's decision in *Heck*, which held:

> [W]hen a state prisoner seeks damages in a § 1983 suit, the district court must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence; if it would, the complaint must be dismissed unless the plaintiff can demonstrate the conviction or sentence has already been invalidated. But if the district court determines that the plaintiff's action, even if successful, will *not* demonstrate the invalidity of any outstanding criminal judgment against the plaintiff, the action should be allowed to proceed, in the absence of some other bar to the suit.

*Id.* at 487. Here, Witt pled guilty to, and later was convicted of, misdemeanor possession of marijuana after he was arrested by Officers Shutes and Sampson. Accordingly, Defendants argue that *Heck* bars Witt's § 1983 claim because it amounts to an impermissible collateral attack on the possession charge.

In *Smith v. City of Hemet*, the United States Court of Appeals for the Ninth Circuit considered similar circumstances. 394 F.3d 689 (9th Cir. 2005). Plaintiff Smith brought

an excessive force claim under § 1983 against the City of Hemet because, in the course of his arrest, Smith was sprayed with pepper spray and attacked by a police dog. After his arrest, Smith pled guilty to resisting or obstructing an officer. However, Smith's obstructive conduct occurred before the officers used force against him. Accordingly, the court held that "[a] conviction based on conduct that occurred *before* the officers commence the process of arresting the defendant is not 'necessarily' rendered invalid by the officers' subsequent use of excessive force in making the arrest." *Id.* at 696 (quoting *Heck*, 512 U.S. at 487). The court also noted the record before it did not disclose the factual basis for Smith's guilty plea, which obviated summary judgment under *Heck* since there was no way to determine whether the § 1983 claim necessarily implied the invalidity of the obstruction conviction.

Here, Defendants' argument is identical to the defendants' argument in *Smith*. And, just as the Ninth Circuit rejected that argument in *Smith*, the Court rejects it here. The record before the Court does not disclose the factual basis for Witt's plea on the possession charge. Consequently, the Court cannot determine whether Plaintiff's § 1983 claim would necessarily imply the invalidity of his conviction for possession. Moreover, it is undisputed that Witt had marijuana loose on his lap when Sampson approached Witt's vehicle—*before* the encounter that gave rise to Witt's excessive force claim. These circumstances indicate that *Heck* does not bar Witt's § 1983 claim.

**B.** **_Qualified Immunity_**

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or

constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). An officer with qualified immunity is not liable even when his or her conduct resulted from "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Id.* (internal quotations omitted).

There are two prongs to the qualified immunity analysis: (1) whether the officers' conduct, viewed in the light most favorable to the party asserting injury, violated a constitutional right and (2) whether the right "was clearly established" such that a reasonable officer would have known his conduct violated the right. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). However, the Court need not address these issues in a particular order. *Pearson*, 555 U.S. at 236, *receding from Saucier*, 533 U.S. 194. Rather, it is within the Court's discretion to decide which prong to address first in light of the circumstances of the case and considerations of judicial economy. *Id.* Here, the Court considers whether either officer used excessive force on Witt before analyzing whether their use of force violated a clearly established right.

### i. *Excessive Force*

The United States Supreme Court has recognized that officers making a lawful arrest have the right to employ "some degree of physical coercion or threat thereof" to effect the arrest. *Graham v. Connor*, 490 U.S. 386, 396 (1989). However, the amount of force must be reasonable. *Id*. Accordingly, excessive force claims are analyzed under the Fourth Amendment's "objective reasonableness" standard. *Id*. at 388. This inquiry "requires a careful balancing of the nature and quality of the intrusion on the individual's

Fourth Amendment interests against the countervailing government interests at stake." *Id.*
*at* 396).

The Ninth Circuit Court of Appeals employs a three-step analysis to determine
whether law enforcement officers used excessive and, therefore, constitutionally
unreasonable force. *Miller v. Clark County*, 340 F.3d 959 (9th Cir. 2003). "First, we
assess the gravity of the particular intrusion on Fourth Amendment interests by
evaluating the type and amount of force inflicted." *Id.*, at 964. Second, the court assesses
"the importance of the government interests at stake" by evaluating the factors set forth
by the United States Supreme Court in *Graham*. These factors include: (1) the severity of
the crime at issue; (2) whether the suspect posed an immediate threat to the safety of the
officers or others; and (3) whether the suspect was actively resisting arrest or attempting
to evade arrest by flight. *Graham*, 490 U.S. at 396. Third, the court must consider the
totality of the circumstances and weigh the gravity of the intrusion against the
government's interest to determine whether the force employed was constitutionally
reasonable. *Miller*, 340 F.3d at 964; *see also Franklin v. Foxworth*, 31 F.3d 873, 876 (9th
Cir. 1994) (stating the "inquiry is not limited to the specific *Graham* factors, . . . [the
court] must look to whatever specific factors may be appropriate in a particular case,
whether or not listed in *Graham*, and then must consider 'whether the totality of the
circumstances justifies a particular sort of seizure.'") (quoting *Graham*, 490 U.S. at 396).

### a. *Type and Amount of Force*

First, the Court considers the type and amount of force used. Witt's claims in this
regard are imprecise. Witt clearly alleges both officers used excessive force by firing

their tasers at him. (Dkt. 1¶ 28.) And there is no dispute that Officer Sampson tased Witt. However, the record is less clear with regard to Officer Shutes because his taser had no effect on Witt. Shutes stated: "[o]ne of mine, the [taser] probe landed off a ways" and "one… was dangling… or in an area of [Witt's] shorts." (Dkt. 58-4, Shutes Depo. 80:3-11.) There is no evidence showing that a probe from Shutes's taser actually contacted Witt's body. In fact, when asked at his deposition "Who tased you?," Witt responded "Officer Sampson." (Dkt. 58-3, Witt Depo. 63:24-25.)

At the summary judgment stage, "if direct evidence produced by the moving party conflicts with direct evidence produced by the nonmoving party, the judge must assume the truth of the evidence set forth by the nonmoving party with respect to that fact." *T.W. Elec. Servs., Inc.*, 809 F.2d at 630-31 (citations omitted). Witt's direct testimony is that only Officer Sampson tased him. Accordingly, the Court finds that Witt's direct testimony and the undisputed facts do not support an excessive force claim in connection with Officer Shutes's use of the taser.

Aside from Officer Sampson's use of his taser, Witt alleges another use of excessive force against him. Witt alleged in his Complaint and testified that, after Sampson's taser incapacitated him and caused him to fall backward, one or both officers delivered several blows to Witt's head. (Dkt. 58-3, Witt Depo. 64:19-25, 65:1-21.) Witt also claims he rolled onto his stomach to protect himself from the blows. (*Id.*) It is undisputed that Witt was bleeding from the left side of his head, yet photos of the scene show Witt lying on his back with a pool of blood to the right of his head. (Dkt. 58-6 at 7-

8.) This evidence is consistent with Witt's account that he fell, struck the back of his head, and then rolled onto his chest to protect himself from the officers.

Although both officers deny striking Witt after he fell, Defendants' motion for summary judgment focuses exclusively on the taser incident. As such, Defendants have not demonstrated they are entitled to judgment as a matter of law for conduct after the tasing. Here, again, Witt's direct testimony must be accepted, as the Court is not at liberty to resolve the credibility issues raised by conflicting accounts of the incident.

Thus, the Court will analyze whether Officer Sampson's use of the taser or the alleged battery by one or both officers amounts to excessive force. The Ninth Circuit has held that the use of a taser in dart mode "constitutes an intermediate, significant level of force that must be justified by the governmental interest involved…." *Bryan v. MacPherson*, 630 F.3d 805, 810 (9th Cir. 2010). Striking an incapacitated suspect's head also qualifies as a significant, possibly extreme, level of force that must be balanced against the need for force under the circumstances. *Blankenhorn v. City of Orange*, 485 F.3d 463, 480 (9th Cir. 2007); *see also Davis v. City of Las Vegas*, 478 F.3d 1048, 1055 (9th Cir. 2007) (slamming subject's head into wall was an "extremely severe" use of force).

> b.     *Application of the* Graham *Factors*

Second, the Court must evaluate the *Graham* factors to determine the importance of the government interests at stake during Witt's arrest. In assessing these factors, the Court is mindful of "the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the

amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97.

There is a "need to protect officials who are required to exercise their discretion and the

related public interest in encouraging the vigorous exercise of official authority." *Harlow*

*v. Fitzgerald*, 457 U.S. 800, 807 (1982). This is in keeping with the purpose of qualified

immunity—namely, "to strike a balance between the competing 'need to hold public

officials accountable when they exercise power irresponsibly and the need to shield

officials from harassment, distraction, and liability when they perform their duties

reasonably.'" *Mattos v. Agarano*, 661 F.3d 433, 440 (9th Cir. 2011) (en banc) (quoting

*Pearson v. Callahan*, 555 U.S. 223, 231 (2009)).

The first *Graham* factor is the severity of the crime at issue. Witt's encounter with

the officers began as a legitimate traffic stop for Witt's failure to maintain his lane.[11]

Before Witt was ordered out of his vehicle, Sampson smelled marijuana and observed a

green leafy substance in Witt's lap. After exiting his vehicle, Witt and Officer Sampson

grappled, Witt fled, and Witt was seen throwing items as he ran. By the time Witt

stopped running, his conduct had risen from the level of a minor traffic infraction to drug

possession to possible felony evidence concealment. In fact, Witt was convicted of

misdemeanor marijuana possession and charged with misdemeanor obstruction, felony

methadone possession, and felony evidence concealment in connection with his conduct

---

[11]     There is no genuine dispute that Witt twice failed to maintain his lane while Sampson
was following his vehicle or that Sampson initiated the stop because of this conduct. (Dkt. 51-8,
Sampson Aff. ¶ 6, Ex. D.)

before the tasing. (Dkt. 51-3 at 5-9.) Thus, the record reveals a pattern of increasingly serious, albeit not particularly egregious, criminal conduct. This factor favors the officers.

Next, the Court must examine the "most important *Graham* factor": whether Witt "posed an immediate threat to the safety of the officers or others." *Mattos*, 661 F.3d at 441 (internal quotations omitted). Prior to the scuffle with Sampson, it is undisputed that Witt drove somewhat unsteadily, hit the curb before as he stopped his vehicle, held a quantity of loose marijuana in plain view of a police officer, and had to be told to put his vehicle in park before he exited. All of these behaviors could lead a reasonable officer to believe that Witt was under the influence of drugs or alcohol. In fact, Officer Sampson suspected Witt was under the influence when he initiated the traffic stop. (Dkt. 51-7, Sampson Aff. ¶ 6.)

On the other hand, several circumstances suggest that Witt has not an immediate threat when he was tased or after he was incapacitated. Although Sampson characterizes Witt as "formidable[,] muscular, young, and very strong," (Dkt. 58-5, Sampson Depo. 62:16), Witt was outnumbered by the two officers. Witt was also unarmed and shirtless, which raises an inference that the officers could tell he was unarmed. Despite taking place at night in a residential neighborhood, there were no bystanders at the encounter. Most importantly, when the evidence is viewed in the light most favorable to Witt, Sampson tased Witt while standing well beyond Witt's striking distance and *after* he surrendered in compliance with the officers' orders. Construing this evidence as it must, the Court concludes Witt initially posed some threat to officer safety but he was compliant and had surrendered at the time he was tased.

After Sampson tased Witt, Witt fell, hit his head on a concrete driveway, and was otherwise incapacitated. According to Witt, the officers nevertheless struck his head several times before he lost consciousness. Witt obviously posed no threat to anyone after he was tased. Thus, the second and most important *Graham* factor favors Witt.

Third and finally, the Court must examine whether Witt "was actively resisting arrest or attempting to evade arrest by flight." *Mattos*, 661 F.3d at 441. The facts on this point are in dispute. According to Witt, Officer Sampson did not tell Witt that he was under arrest at any time prior to the tasing. Instead, Witt maintains that Sampson grabbed him by the arm, which caused him to fear for his safety, struggle, break free, and run. Although a fact-finder could rationally characterize this behavior as resisting arrest or evading arrest by flight, the Court must at this point view the disputed facts in Witt's favor. The key disputed fact is whether Officer Samspon told Witt he was under arrest before, or as, Witt exited his vehicle.

Based on this fact, the Court can infer that Witt grappled with Sampson and fled not to evade arrest, but to escape an aggressor. Even so, Witt also obeyed the officers' orders to stop. Regardless, the officers deployed their tasers while Witt, standing approximately 10 feet away, raised his hands in surrender. Although Witt initially attempted to escape, he stopped and yielded when told to do so. Moreover, Witt certainly was not resisting or evading arrest when the alleged battery occurred. Therefore, the third factor also favors Witt.

In sum, the *Graham* factors cut in favor of Witt. Although Witt engaged in an escalating pattern of criminal conduct, Witt claims he resisted Officer Sampson and ran

only after Sampson grabbed his arm for no stated reason. Giving chase, the officers warned Witt to stop or be tased. Witt complied, and Officer Sampson tased him anyway. Finally, Witt's testimony is that one or both officers delivered additional blows to his head after he was on the ground, incapacitated, and obviously no threat to anyone.

### c. *Totality of the Circumstances*

Police officers need not utilize the least necessary force to effect an arrest. *Luchtel v. Hagermann*, 623 F.3d 975, 982 (9th Cir. 2010). But they must reasonably assess the circumstances before subjecting another person to the intense pain and incapacitation that comes with a "dual hemisphere hit" and four seconds of controlled electrocution. *See Bryan*, 630 F.3d at 824. Indeed, that is precisely what Pocatello's taser guidelines and his training required Officer Sampson to do. (Dkt. 51-10 at § 309.4.1 ("officers should carefully consider and balance the totality of the circumstances available prior to using the TASER.").)

Yet Sampson fired—on a formerly resistant but newly cooperative subject standing out of reach on a concrete driveway. Witt, by virtue of his erratic behavior, physical attributes, and earlier resistance, may have posed some threat to the officers. His surrender may have been a ruse. But he was apparently unarmed, well beyond striking distance, and obviously outnumbered by two officers with the training to subdue him. Sampson, a trained officer and taser instructor, either knew or should have known there was great risk Witt would be incapacitated, fall on the concrete, and suffer a collateral injury. (*Id.* at § 309.4.3(e).) Witt did fall and did suffer a potentially life-threatening head

injury. Then, after Witt fell, one or both officers allegedly battered his already injured head.

Viewing the disputed facts in the light most favorable to Witt, the Court finds Sampson chose to use significant force against a suspect who surrendered and posed minimal threat to officer or public safety. Given the totality of the circumstances, a reasonable jury could conclude that Sampson's use of the taser constituted unreasonable and excessive force. In addition, a reasonable jury could conclude that one or both officers battered Witt while he was on the ground, which would be flagrantly excessive if proved.

### ii. *Violation of Clearly Established Law*

Because a reasonable jury could conclude the officers violated Witt's right to be free from unreasonable and excessive force, the Court must next determine whether the right was clearly established at the time of the conduct. The specific issue is whether the right was "'sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'" *Mattos*, 661 F.3d at 442 (quoting *Ashcroft v. al-Kidd*, —U.S.—, 131 S.Ct. 2074, 2083 (2011)). This is a pure question of law. *Mitchell v. Forsyth*, 472 U.S. 511, 527 (1985).

A right is sufficiently clear when existing precedent puts the constitutional question "beyond debate." *al-Kidd*, 131 S.Ct. at 2083. The United States Supreme Court has instructed lower courts "not to define clearly established law at a high level of generality." *Id.* at 2084. Rather, "the right allegedly violated must be defined at the appropriate level of specificity before a court can determine if it was clearly established."

*Wilson v. Layne*, 526 U.S. 603, 615 (1999). After all, qualified immunity is intended to "give[] government officials breathing room to make reasonable but mistaken judgments about open legal questions," thereby protecting "'all but the plainly incompetent or those who knowingly violate the law.'" *al-Kidd*, 131 S.Ct. at 2085 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

The two rights at issue here are more specific than the general Fourth Amendment right to be from unreasonable seizure. First is Witt's right to be free from significant force, such as a taser in dart mode, when such force cannot be justified under the circumstances. This is the right implicated by Officer Sampson's use of the taser on Witt. Second is Witt's right to be free from non-trivial force once pacified. This right is implicated by the officers' alleged conduct after Witt fell to the ground and struck his head.

At the time of Witt's arrest in February, 2011, the Ninth Circuit had decided at least three cases involving tasers: *Bryan*, *Brooks*, and *Mattos*. In each case, a three-judge panel found the officers involved were entitled to qualified immunity. *Bryan*, 630 F.3d 805; *Brooks v. City of Seattle*, 599 F.3d 1018 (9th Cir. 2010), *vacated en banc by Mattos*, 661 F.3d 433; *Mattos v. Agarano*, 590 F.3d 1082 (9th Cir. 2010), *vacated en banc by Mattos*, 661 F.3d 433. After Witt's arrest, the Ninth Circuit reheard *Brooks* and *Mattos* en banc. In the consolidated en banc case, the court concluded that, although both cases involved the use of unconstitutional and excessive force, the officers were nonetheless entitled to qualified immunity because their use of tasers against minimally resistant subjects did not violate clearly established law. *Mattos*, 661 F.3d 433. Qualified

immunity was also granted to the officer in *Bryan* who used a taser in dart mode against an unarmed but belligerent and noncompliant subject pulled over for a seatbelt violation. 630 F.3d at 822, 830.

By contrast, the Ninth Circuit has more recently held the "right to be free from the application of non-trivial force for engaging in mere passive resistance was clearly established prior to 2008." *Gravelet-Blondin v. Shelton*, 728 F.3d 1086 (9th Cir. 2013). In that case, the officer used dart mode on a non-resistant, unarmed bystander standing 37 feet away. *Id.* at 1091-92. In fact, the bystander's behavior was so benign that the court questioned whether there was sufficient probable cause to arrest him for obstruction. *Id.* As such, the Ninth Circuit concluded the officer's use of the taser against the passive, unthreatening plaintiff was so egregious that the constitutional question was beyond debate years before the decisions in *Bryan* and *Mattos*.

The then-evolving case law and the fact-intensive analysis above demonstrate that Sampson's use of the taser was not obviously unconstitutional. The decisions in *Bryan*, *Mattos*, and *Gravelet-Blondin* stand for the propositions that the use of a taser in dart mode can, in particular circumstances, constitute excessive force and that qualified immunity may be denied when tasers are used on passive subjects. But excessive force claims generally—and taser cases in particular—require courts to "slosh [their] way through the factbound morass of 'reasonableness.'" *Mattos*, 661 F.3d at 441 (quoting *Scott v. Harris*, 550 U.S. 372, 383 (2007)) (alteration in original). Here, the path through the morass leads to a jury question, and the answer depends largely on credibility determinations the Court is not at liberty to make.

It is clear, however, that Witt, unlike the plaintiff in *Gravelet-Blondin*, was not a completely passive subject prior to the tasing. Although Witt stopped and—he claims—surrendered, he did so after grappling with Officer Sampson and running off into a residential neighborhood at night while discarding what were later found to be methadone pills. Moreover, Sampson used the taser in the context of a fast-moving situation where, only moments earlier, Witt had driven erratically, handled marijuana in plain view, and actively resisted Sampson's initial attempt to subdue him. Even though the facts viewed in Witt's favor establish a constitutional violation, a reasonable officer in Sampson's position could mistake Witt for someone bound to resist arrest or endanger others. Consequently, Officer Sampson does not deserve to be labeled plainly incompetent or a knowing violator of the law with respect to his use of the taser. Sampson made the snap decision to deploy his taser in a fluid situation governed by law that was not clearly established at the time. Therefore, Sampson is entitled to qualified immunity for his use of the taser.

On the other hand, it was clearly established before 2008 that an arresting officer may not use non-trivial force against a passive subject. No reasonable officer would believe it would be constitutional to strike an incapacitated subject in the head, especially when the subject just received a four-second taser cycle and smacked the back of his head on a concrete driveway. If a jury finds that one or both officers struck Witt after he fell, qualified immunity will not shield them from liability. Thus, only one part of Witt's § 1983 excessive force claim survives summary judgment—the part that alleges one or both officers struck his head after he was tased.

This conclusion is compelled by the legal standards for summary judgment motions. *See Gonzalez v. City of Anaheim*, —F.3d—, 2014 WL 1274551 at *5 (9th Cir. March 31, 2014) (en banc). Indeed, the Ninth Circuit has repeatedly held that summary judgment in excessive force cases should be "granted sparingly." *Smith*, 394 F.3d at 701 (quoting *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002)). On this record, the Court cannot conclude that every reasonable jury would find the officers did not strike Witt's head after he was tased. The evidence on this point is disputed, but Witt's testimony and the undisputed facts—the pool of blood to the right of Witt's head when Witt has bleeding from the left side of his head—are enough for the claim to survive summary judgment. If the evidence is viewed in Witt's favor, it establishes a brutal course of conduct by at least one officer that obviously violates clearly established law. But the Court emphasizes it does "not hold that a reasonable jury must find in favor of [Witt] on this record, only that it could." *City of Anaheim*, 2014 WL 1274551 at *6.

## C.    *Municipal Liability*

Witt seeks to hold liable the City of Pocatello, the Pocatello Police Department, and former Police Chief J.R. Miller (Municipal Defendants) for maintaining an institutionalized practice, pattern, or custom of abusing suspects consistent with the way Witt was treated on February 20, 2011. (Dkt. 1 ¶ 34.) In addition, Witt claims Chief Miller, and by extension the City, knew of Sampson's and Shute's abusive propensities but did nothing to appropriately train them or otherwise discourage their abusive practices. (*Id.* ¶ 35-36.) Chief Miller is sued in both his individual and official capacity. (*Id.* ¶ 6.)

The same standard of liability applies to governmental entities and to governmental official sued in their official capacities. *Larez v. City of Los Angeles*, 946 F.2d 630, 646 (9th Cir. 1991). The United States Supreme Court held in *Monell v. Dept. of Soc. Servs. of City of New York*, 436 U.S. 658, 690 (1978), that "local governing bodies… can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where… the action that is alleged to be unconstitutional implements or executes a policy, statement, ordinance, regulation, or decisions officially adopted and promulgated by that body's officers." However, under § 1983, a local governing body cannot be held vicariously liable solely because its employee is a constitutional wrongdoer. Rather, the Plaintiff must show the entity or official "had a deliberate policy, custom, or practice that was the 'moving force' behind the constitutional violation he suffered." *Galen v. County of L.A.*, 477 F.3d 652, 667 (9th Cir. 2007) (quoting *Monell*, 436 U.S. at 694-95).

The standard is somewhat different when a government official not directly involved in the constitutional tort is sued in his or her individual capacity. Section 1983 liability attaches to a supervisor, such as Chief Miller, only if the supervisor "set in motion a series of acts by others, or knowingly refused to terminate a series of acts by others, which he knew or reasonably should have known, would cause others to inflict the constitutional injury." *Larez*, 946 F.2d at 646.

The record properly before the Court is devoid of evidence to support either theory of imputed liability. Witt claims Miller's alleged supervisory misconduct is like that the police chief in *Graves v. City of Coeur D'Alene*, 339 F.3d 828 (9th Cir. 2003), *abrogated on other grounds by Hiibel v. Sixth Judicial District Court of Nevada*, 542 U.S. 177

(2004). But *Graves* is readily distinguishable. That case involved an officer who radioed his supervisor for instructions after a suspect with a suspicious backpack would not consent to a search. The supervisor told the officer to "deal with it," whereupon the officer put flex cuffs on the suspect's hands and searched the backpack only to find food and clothing. *Id.* at 837. The Ninth Circuit concluded the supervisor's response presented a jury question as to whether the supervisor "set in motion" acts that lead to an unconstitutional search. *Id.* at 848.

Here, there is no evidence Chief Miller knew of, much less set in motion, the officers' encounter with Witt. Moreover, the undisputed evidence is that Officers Shutes and Sampson were trained on both the use of force and the use of tasers. There is simply no evidentiary link between Witt's injury and any action by Chief Miller in his individual capacity.

Nor is there evidence that the City, the Police Department, or Chief Miller adopted a policy or custom authorizing the use of excessive force against Witt or anyone else. To the contrary, the record indicates that the Pocatello Police Department adopted and implemented formal polices governing the use of force generally and the use of tasers specifically. (Dkt. 51-10 (taser policy); Dkt. 51-11 (use of force policy).) In accordance with established law, both policies instruct officers that any use of force, whether by taser or otherwise, must be reasonable under the totality of the circumstances. (*Id.*) Furthermore, both Officers Sampson and Shutes were aware of and trained on these polices at the time of Witt's arrest. (Dkt. 51-4, Shutes Aff. ¶¶ 4, 15; Dkt. 51-7, Sampson Aff. ¶¶ 4, 16.) In the face of this showing, it is Witt's burden to come forward with

evidence—not just conclusory statements in his pleadings—to bolster his claims. *See Celotex*, 477 U.S. at 322-23. Witt has not carried this burden.

The only alleged evidence Witt offers to contradict the Municipal Defendants' formal policies is not properly before the Court. As discussed in the context of Defendants' motion to strike, Witt attempted to introduce, as an exhibit to Paragraph 13 of his statement of disputed facts, a March 31, 2010 memorandum to "ALL POLICE EMPLOYEES" concerning Ninth Circuit taser cases. Witt did not provide adequate foundation for this memorandum nor did he file a brief in opposition to Defendants' motion to strike. Consequently, there is no evidence in the record to contradict the Municipal Defendants' formal policies, which are properly before the Court.

Far from establishing a systematic policy in favor of abusive police tactics, the record contains no evidence that the Municipal Defendants officially condoned constitutional violations. Regardless of the constitutionality of the officers' conduct, Witt has not connected their conduct to any policy, practice, or custom that would support municipal liability under *Monell*. Nor has Witt presented evidence that Chief Miller should be held individually liable for the officers' conduct. Given this lack of evidence, Witt's arguments boil down to a respondeat superior claim not cognizable under § 1983. The Municipal Defendants are entitled to judgment as a matter of law and Witt's claims against them will be dismissed.

## 2.      State Law Claims

In addition to his § 1983 claims, Witt alleges Defendants are liable for a slew of torts based on the officers' conduct during his arrest. (Dkt. 1 ¶ 43.) In particular, Witt

claims the officers' conduct constitutes "assault, battery, false arrest, excessive force, negligent and intentional infliction of emotional distress, conspiracy, negligence and gross negligence." (*Id.*)

The Court has the constitutional power to hear these pendent state law claims because they share "a common nucleus of operative facts" with Witt's federal claims. *United Mine Workers v. Gibbs*, 383 U.S. 715, 725 (1966); *see also* 28 U.S.C. § 1367(a) ("the district courts shall have supplemental jurisdiction over all other claims that are so related to the claims in the action with [the courts'] original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution").

Witt's state law claims involve complex issues of Idaho tort law and official immunity under the Idaho Tort Claims Act. However, the parties only superficially address these matters in their briefs. Under Idaho law, official immunity extends to "a governmental entity and its employees while acting within the course and scope of their employment and without malice or criminal intent." Idaho Code § 6-904. The statute further delineates the types of claims to which official immunity may attach, including "any claim which… [a]rises out of assault, battery, [and] false arrest." *Id.* at § 6-904(3). The parties briefly dispute whether the "arises out of" language extends official immunity to torts other than those enumerated in Idaho Code § 6-904(3). But the parties cite no authority to support their respective positions. Without the benefit of developed briefing, the Court is unable to render a decision as a matter of law on the official immunity issue.

Defendants also argue that Witt's claims for intentional infliction of emotional distress (IIED) and negligent infliction of emotional distress (NIED) must be dismissed

as a matter of law. Aside from arguing that IIED and NIED are not covered by the official immunity statute, Witt does not counter this argument.

With regard to IIED, Defendants assert "[b]eing tased and arrested" is not sufficiently extreme and outrageous to support an IIED claim. (Dkt. 51-1 at 19.) It is true that "extreme and outrageous conduct" is an element of IIED and that merely unjustifiable conduct is not enough. *Edmondson v. Shearer Lumber Products.*, 75 P.3d 733, 740 (Idaho 2003). The conduct must "rise to the level of 'atrocious' and 'beyond all possible bounds of decency' that would cause an average member of the community to believe it was 'outrageous.'" *Id.* But Defendants argument on this point overlooks Witt's evidence that he was struck in the head by an arresting officer after suffering through a controlled electrocution and smacking his head on a concrete driveway. Although a reasonable jury may not credit this evidence, a jury could rationally find the officers' conduct, if proved, qualifies as extreme and outrageous.

On the other hand, Witt's NIED claim is subject to judgment as a matter of law. Defendants explain that a necessary element of NIED is "emotional distress [that] results in a physical manifestation of an injury." *Black Canyon Racquetball Club, Inc. v. Idaho First Nat'l Bank*, 804 P.2d 900, 906 (Idaho 1991). Defendants further note that Witt produced no evidence that would satisfy this element. Indeed, there is nothing in the record to indicate Witt suffered an emotional injury, much less a physical manifestation thereof. Nor does Witt attempt to counter this point in his brief. Thus, Witt has not met his burden of presenting specific facts that create a genuine issue for trial on the NIED claim.

The record contains material issues of fact related to official immunity under the Idaho Tort Claims Act and Witt's IIED claim. Foremost among these factual disputes is whether Officer Sampson or Officer Shutes struck Witt in the head after he was tased. With the exception of the NIED claim, the Court is unable to grant judgment as a matter of law on Witt's state law claims.

## CONCLUSION

Defendants' Motion for Summary Judgment will be granted in part and denied in part. The parties are strongly encouraged to clarify the issues remaining for trial in accordance with the legal principles discussed above. The Court will conduct a telephonic scheduling conference with the parties to discuss available trial dates and to set pre-trial deadlines. A separate notice of hearing is forthcoming.

# ORDER

**NOW THEREFORE IT IS HEREBY ORDERED:**

1) Defendants' Motion for Summary Judgment (Dkt. 51) is **GRANTED IN PART AND DENIED IN PART**. Plaintiff's § 1983 claim that Defendant Sampson or Defendant Shutes battered his head after he was tased survives summary judgment, as do all of Plaintiff's state law claims related to this conduct—except for Plaintiff's claim for negligent infliction of emotional distress.

2) Defendants' Motion to Strike (Dkt. 59) is **GRANTED IN PART AND DENIED IN PART**.

Dated: April 03, 2014

Honorable Candy W. Dale
United States Magistrate Judge